# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RONALD GROSS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 04 C 4297** |
| **v.** | ) | |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| **RADIOSHACK CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald Gross ("Gross") brought this action alleging that defendant RadioShack Corporation ("RadioShack") terminated his employment based on his sex (male) and race (white) in violation of Title VII, 42 U.S.C. § 2000e, and based on his age (over 40) in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626. (Compl. ¶¶ 17, 18, 20, 21, 23, 24.) [Dkt 1.] This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. RadioShack has moved for summary judgment on all counts of the Complaint. [Dkt 30.] The parties have consented to the jurisdiction of a Magistrate Judge. [Dkt 53, 57, 58.] For the reasons set out below, RadioShack's motion for summary judgment is granted.

# FACTUAL BACKGROUND[1]

## A.    Gross's Employment with RadioShack

Gross is a white male who was hired by RadioShack in 1976 as a Manager Trainee in the Naperville, Illinois store.  (Pl.'s LR Resp. ¶¶ 3, 5; Def.'s LR Resp. ¶ 1.)  Gross was promoted to store manager the following year, and eventually to senior store manager.  (Def.'s LR Resp. ¶ 1.)[2]  During his employment at RadioShack, Gross also worked at a RadioShack store in the Charlestowne Mall, and subsequently, at a RadioShack store in Batavia.  (Pl.'s LR Resp. ¶¶ 9, 56; Def.'s LR Resp. ¶ 21.)  As a store manager, Gross was responsible for sales, controlling expenses, recruiting and training staff, and displaying merchandise.  (Pl.'s LR Resp. ¶ 7.)  Gross was 49 years old when his employment was terminated in January 2004.  (Pl.'s LR Resp. ¶¶ 3, 5.)

Until 2003, Gross had an overall positive work record.  He was promoted on numerous occasions and received numerous RadioShack awards, including "Manager of the month," "Top sales gain," "Best store appearance," and "Leader's Club."  (Def.'s LR Resp. ¶ 2; Pl.'s LR Ex. A, Gross Aff. ¶ 3.)  Gross also served as a team leader for approximately 10 years, a position which required him to provide advice and direction to other store managers, as well as relay various facts and figures to the district office.  (Def.'s LR Resp. ¶ 3; Pl.'s LR Resp. ¶ 57; Def.'s LR Ex. 2, Gross

---

[1] The following facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, cited herein as: "Pl.'s LR Resp. ¶ ___" [dkt 40], "Def.'s LR Resp. ¶ ___" [dkt 48], and "Def.'s LR Reply ¶ __" [dkt 48], as well as from the exhibits submitted with those statements or responses to those statements, cited herein as: "Pl.'s LR Ex. ___" [dkt 41, 42], "Def.'s LR Ex. ___" [dkt 35], and "Def.'s Reply Ex. ___" [dkt 49].

[2] Store managers are eligible for promotion to senior store manager after five years of continued service.  (Pl.'s LR Resp. ¶ 8.)  The designation "senior" does not refer to a manager's age.  (Pl.'s LR Resp. ¶ 8.)

Dep. at 153-54; Gross Aff. ¶ 15.) Although he was placed on RadioShack's "Watch, Concern, Notice" counseling procedure in March 2002, Gross's performance improved and he did not advance to the second step of the procedure at that time. (Pl.'s LR Resp. ¶ 26; Def.'s LR Ex. 3, Bates No. 000045.)[3] In fact, despite being placed on "Watch" in the beginning of 2002, Gross was subsequently awarded the maximum number of stock options for his overall performance that year, which ranked in the upper third of the nation. (Def.'s LR Resp. ¶ 5.)

In around September 2002, Gross was granted a request to transfer from the Batavia store to the Aurora store. (Pl.'s LR Resp. ¶ 9; Def.'s LR Resp. ¶ 21.) Gross requested the transfer for the primary reason that his mother was ill and the Aurora store was closer to her. (Pl.'s LR Resp. ¶ 10.) Gross also requested the transfer because he was concerned about competition from a Best Buy store and a Circuit City store that were located down the street from the Batavia store. (Pl.'s LR Resp. ¶ 10; Def.'s LR Resp. ¶ 21.)

At the time of the transfer, Richard de la Hunt, who was Gross's district manager at the time, presented Gross with a memorandum setting forth a list of expectations Gross would have to meet as manager of the Aurora store. (Def.'s LR Reply ¶ 11; Def.'s LR Ex. 3, Bates No. 000060; Gross Dep. at 30.)[4] The memorandum advised Gross that his personal sales must not fall below $17,000

_____

[3] Gross was placed on "Watch" because his record for 2001 consisted of seven months of sales losses, with an end result of sales being down 6.41%. (Pl.'s LR Resp. ¶ 26; Def.'s LR Ex. 3, Bates No. 000045.) The counseling report noted further that Gross had posted a 21% loss in January 2002 and a 22% loss up to that point in March. (Pl.'s LR Resp. ¶ 26; Def.'s LR Ex. 3, Bates No. 000045.)

[4] Store managers report to a district manager, who provides feedback regarding their performance. (Pl.'s LR Resp. ¶¶ 15, 16.) This feedback is often provided through "store visit reports," which are reports that reflect meetings between the store manager and the district manager. (Pl.'s LR Resp. ¶ 16.)

per month; that leaving work early and not placing certain advertisement inserts would not be tolerated; that he must take the store to a $30 ticket average; that he must achieve a certain satellite hit rate; that he must maintain a "wireless hit rate" range of 25-32 and a "401 status" for his store;[5] and that he must hold Saturday morning meetings consistently with his staff. (Pl.'s LR Resp. ¶ 12; Def.'s LR Ex. 3, Bates Nos. 000060, 000061.) The memorandum warned Gross that if he "fail[ed] to achieve these expectations, [he would] be put immediately on the [W]atch step." (Pl.'s LR Resp. ¶ 13; Def.'s LR Ex. 3, Bates No. 000061.) Gross read and signed the memorandum, agreeing to the above expectations. (Pl.'s LR Resp. ¶ 14; Def.'s LR Ex. 3, Bates No. 000061; Gross Dep. at 31.) During his first four months at the Aurora store, Gross realized sales gains of 19%. (Def.'s LR Resp. ¶ 4; Gross Aff. ¶ 6.)

**B.     Gross's Performance in 2003**

In January 2003, approximately four or five months after Gross transferred to the Aurora store, Stephanie Potter replaced de la Hunt as Gross's district manager. (Pl.'s LR Resp. ¶ 15.) In a store visit report dated January 30, 2003, Potter noted that Gross's performance for January 2003 was below expectations, as his store did not demonstrate a sales gain that month. (Pl.'s LR Resp. ¶ 17.) (Monthly sales records are calculated by comparing a store's current monthly sales with the store's monthly sales of the prior year to determine if there has been a gain or loss.) (Def.'s LR Resp. ¶ 7.) Gross acknowledged that fact. (Pl.'s LR Resp. ¶ 17.)

---

[5]  A "wireless hit range" is the number of wireless phones sold compared to the number of sales tickets written. (Pl.'s LR Resp. ¶ 12.) A "401 status" is a rating of the store's appearance. (Pl.'s LR Resp. ¶ 12.)

In February 2003, Gross became aware that the anchor store in the strip mall in which his store was located was going to close down. (Def.'s LR Resp. ¶ 6.) The anchor store, True Value Hardware, had been at the Aurora strip mall for more than 30 years. (Def.'s LR Resp. ¶ 6.) Gross felt that the closing of the anchor store would have an impact on customer and walk-in traffic at his store, although there was also a Wal-Mart at the far end of the strip mall. (Def.'s LR Resp. ¶ 6; Def.'s Reply Ex. A, Gross Dep. at 165-66.)[6] On February 23, 2003, Gross wrote an e-mail to Potter expressing his concern regarding the closing of the True Value Hardware store and requesting a transfer back to the Batavia store. (Pl.'s LR Resp. ¶ 50; Def.'s LR Resp. ¶ 9.) Potter never acknowledged Gross's request and promoted David Bawuah, a black male, to the Batavia store position instead. (Def.'s LR Resp. ¶ 9.) Potter later could not recall Bawuah's work history or the criteria used to hire Bawuah, or his performance at the Batavia store. (Def.'s LR Resp. ¶ 25.)[7] She also could not recall whether she even considered Gross for the position at the Batavia store. (Def.'s LR Resp. ¶ 25; Pl.'s LR Ex. G, Potter Dep. at 58.)[8]

Upon learning that the position had been filled by Bawuah, Gross wrote to Bob Martinjak, RadioShack's Mid-West Division Vice-President, expressing his concern about the situation. (Def.'s LR Resp. ¶ 10.) The memorandum did not mention age, race or sex discrimination as a reason for the denial of the transfer, but referred to a conflict between Gross and his former regional manager,

---

[6] The Wal-Mart store shared an attached parking lot with that of Gross's RadioShack store but was not within walking distance. (Def.'s Reply Ex. A, Gross Dep. at 165-67.)

[7] In responding to Gross's LR Statement of Facts, RadioShack mis-numbered Response Nos. 24, 25, 26, and 27, numbering them as 23, 24, 25, and 26, instead. This opinion cites to the numbers listed on Gross's LR Statement of Facts.

[8] Potter's deposition was taken almost two and a half years after Gross's discharge, and almost 2 years after her own resignation from RadioShack. (Def.'s LR Resp. ¶ 25; Potter Dep. at 1, 5.)

Jim Bradley, which Gross claims began 17 years earlier. (Def.'s LR Resp. ¶ 10; Def.'s Reply Ex. G.) After reviewing Gross's e-mail, Martinjak sent an e-mail to Francesca Spinelli in Human Resources stating: "One suggestion I might offer is letting [Gross] know up front that he is not a top performer with [RadioShack], he is just someone who has hung around for a long time." (Def.'s LR Resp. ¶ 11.) Gross never received a substantive response regarding his e-mail. (Def.'s LR Resp. ¶ 11.)

In a store visit report dated February 26, 2003, Potter noted that sales from Gross's store were down $1,200, a decrease of 3.85%. (Pl.'s LR Resp. ¶ 18; Def.'s LR Ex. 3, Bates No. 000063.) Gross acknowledged that that was true. (Pl.'s LR Resp. ¶ 18; Gross Dep. at 51.) The report further noted that his store's wireless and satellite hit rates were below expectation or unacceptable, and that several of Gross's employees needed to complete their certifications, among other things. (Pl.'s LR Resp. ¶¶ 18, 19; Def.'s LR Ex. 3, Bates No. 000063; Gross Dep. at 51-53.)

In a store visit report dated April 23, 2003, Potter noted several problems, including that many of the phones in Gross's store needed batteries or chargers, that the repair log needed to be updated, that the parts per ticket was $2 below average, that no one in Gross's store was above the district average for wireless index and battery add-on, that Gross needed to have one-on-one and other meetings with his sales associates, and that his store was losing units in satellite. (Pl.'s LR Resp. ¶ 20; Def.'s LR Ex. 3, Bates No. 000062.)

A report dated June 17, 2003 reflected a meeting between Gross and Potter at the district office. (Pl.'s LR Resp. ¶ 21; Def.'s LR Ex. 3, Bates No. 000055.) On the report, Potter set various targets, including training and certifying associates, properly pricing items, and achieving sales goals with respect to wireless and other products. (Pl.'s LR Resp. ¶ 21.) The report allotted Gross 80

payroll hours during selling time, which Gross testified was "standard." (Pl.'s LR Resp. ¶ 21; Gross Dep. at 61.) In a store visit report three days later, Potter documented the fact that one of Gross's sales associates sold a phone without all of the correct paperwork and that employee certifications still needed to be completed. (Pl.'s LR Resp. ¶ 22; Def.'s LR Ex. 3, Bates No. 000054.)

In July 2003, Gross's numbers at his store rebounded significantly, including achieving a ticket average $2.17 above the district average and a gross profit turn of $943, or about 10% of the district total. (Def.'s LR Resp. ¶ 13; Gross Aff. ¶ 14.) Despite that fact, Gross's store again did not record a sales gain that month compared to the previous year. (Def.'s LR Resp. ¶ 13; Gross Aff. ¶ 14.)

In a store visit report dated August 15, 2003, Potter notified Gross that he was being placed on "Watch" (the first step in RadioShack's formal counseling process) for unsatisfactory job performance. (Pl.'s LR Resp. ¶ 23; Def.'s LR Ex. 3, Bates No. 000036.) Potter's report noted that Gross "ranked at the bottom of [his] district and 220/221 in the region on the performance rankings year to date." (Pl.'s LR Resp. ¶ 23; Def.'s LR Ex. 3, Bates No. 000036.) Potter further noted that his store's sales were down 21%, and profits were down 10%. (Pl.'s LR Resp. ¶ 23; Def.'s LR Ex. 3, Bates No. 000036.) Potter stated that she expected Gross's store to meet the district average in sales gains and profit turns within the next month. (Pl.'s LR Resp. ¶¶ 23, 24; Def.'s LR Ex. 3, Bates No. 000036.) She set out a list of tasks for Gross to complete to meet those goals, including holding weekly meetings, completing one-on-one employee evaluations and faxing signed copies to the district office on a weekly basis, ensuring that all employees were on track for certifications, using the recommended scheduler to improve customer service, arriving at the store one hour before opening time to perform daily tasks, obtaining 3.5 tickets per employee each hour, submitting

inventory count sheets on a weekly basis, performing an "over/short inquiry" at the start and end of

each day to help manage shortages, and completing daily paperwork. (Pl.'s LR Resp. ¶ 24; Def.'s

LR Ex. 3, Bates No. 000036.) At the end of the report, Potter stated that she knew Gross was

"capable of achieving great success" and hoped he would "make the changes necessary to put [his]

performance back on track." (Pl.'s LR Resp. ¶ 24; Def.'s LR Ex. 3, Bates No. 000036.) Gross

agreed that many of the requirements listed were reasonable but signed the report stating

"acknowledgment of receipt only." (Pl.'s LR Resp. ¶¶ 24, 25; Def.'s LR Ex. 3, Bates No. 000036.)

That month, Gross wrote to Chris Frank, a Regional Director with RadioShack, and made a formal

complaint about Potter and about the adverse effect the closing of the True Value store was having

on his store's sales gains. (Def.'s LR Resp. ¶ 14.) Gross did not inform Frank that he believed any

of Potter's actions were based on his age, race, or sex. (Def.'s LR Resp. ¶ 14; Gross Aff., Ex. 3.)

In a store visit report dated November 5, 2003, Potter noted that Gross's store had a year-to-

date sales loss of 20.2% and a year-to-date profit loss of $21,788. (Pl.'s LR Resp. ¶ 27.) Potter

notified Gross that day via memorandum that he was being moved from "Watch" to "Concern" on

the formal counseling procedure. (Pl.'s LR Resp. ¶ 28; Def.'s LR Ex. 3, Bates No. 000037.) In the

memorandum, Potter set forth a list of tasks for Gross to perform over the next four weeks. (Pl.'s

LR Resp. ¶ 29.) Those tasks included helping 20 customers per day, requiring associates to complete

certain training programs, conducting weekly meetings with associates, requiring employees to

attend every district training meeting, maintaining a store ticket average of $29, completing weekly

count sheets and goal/activity cards for associates and faxing them to the district office on a weekly

basis, and performing drawer counts three times per day and faxing them to the district office daily.

(Pl.'s LR Resp. ¶ 29; Def.'s LR Ex. 3, Bates No. 000037.) Potter warned Gross that if he failed to

execute the listed requirements in 30 days, he would be put on "Notice," the last step of the counseling procedure. (Pl.'s LR Resp. ¶ 30.)

Gross received another memorandum from Potter dated December 10, 2003. (Pl.'s LR Resp. ¶ 31.) That memo recapped the items discussed during their last meeting, and noted that several of the tasks had not been met. (Pl.'s LR Resp. ¶ 31; Def.'s LR Ex. 3, Bates No. 000027.) Potter stated that several associates had not completed the requisite training programs, that she had never received associate goal/activity cards or weekly count sheets which were to have been faxed to the district office on a weekly basis, that the store ticket average failed to meet the $29 ticket average required, and that she did not always receive his daily drawer counts. (Pl.'s LR Resp. ¶ 31; Def.'s LR Ex. 3, Bates No. 000027.) Gross asserts that he did prepare the associate goal/activity cards and weekly count sheets, but delivered rather than faxed them to the district office. (Pl.'s LR Resp. ¶ 32; Gross Dep. at 121.) He also asserts that he submitted daily drawer counts. (Pl.'s LR Resp. ¶ 32.) Gross does not dispute that his associates failed to complete their certifications, but states that he did not have complete control over that requirement because it required the cooperation of the associates. (Pl.'s LR Resp. ¶ 32.) Gross admitted, however, that it was his responsibility as manager to ensure that the associates' certifications were completed. (Gross Dep. at 81.) Gross also does not dispute that the store's ticket average was less than the $29 required. (Pl.'s LR Resp. ¶ 32.) Because Gross failed to complete all of the required tasks and produce profitable sales, Potter moved him from "Concern" to "Notice" on the formal counseling procedure. (Pl.'s LR Resp. ¶ 31; Def.'s LR Ex. 3, Bates No. 000027.) She stated that a failure to create profitable sales growth for the month of December would result in his "removement from management" at RadioShack. (Pl.'s LR Resp. ¶ 31; Def.'s LR Ex. 3, Bates No. 000027.)

## C.     Gross's Discharge

In December 2003, Gross's store achieved a significant profit turnaround and ranked 8 out of 24 in the district.  (Pl.'s LR Resp. ¶ 33; Def.'s LR Reply ¶ 33; Def.'s LR Resp. ¶ 23.)  However, the store again failed to reflect a sales gain that month.  (Pl.'s LR Resp. ¶ 33.)  In fact, the store suffered a sales loss of 16.4%, compared to the district's average loss of 9.4% for the month.  (Def.'s LR Resp. ¶ 23; Def.'s LR Reply ¶ 33; Pl.'s LR Ex. G, Bates No. 000364.)  Thus, for the year 2003, Gross's store lacked profitable sales growth every month, and fell below the district average in 11 of the 12 months.  (Pl.'s LR Resp. ¶ 33; Def.'s LR Resp. ¶ 23; Pl.'s LR Ex. G, Bates Nos. 000353-364.)

On January 4, 2004, Gross was discharged from his employment.  (Pl.'s LR Resp. ¶ 34; Def.'s LR Resp. ¶ 2.)  Potter recommended the discharge, and Frank and Martinjak approved it.  (Pl.'s LR Resp. ¶ 34; Def.'s LR Resp. ¶ 11; Potter Dep. at 20.)  Gross was 49 years old at the time of the discharge.  (Pl.'s LR Resp. ¶¶ 3, 5, 34; Def.'s LR Resp. ¶ 1.)  Gross asserts that Potter specifically told him that demotion was not an option.  (Pl.'s LR Resp. ¶ 45.)  He was replaced by Matt Savage, a white male in his mid-20s.  (Pl.'s LR Resp. ¶ 44.)  At her deposition, Potter testified that she could not recall any conversation with Frank or Martinjak regarding Gross's discharge, and had to review certain documents before she could explain why Gross was discharged.  (Def.'s LR Resp. ¶¶ 26, 27; Potter Dep. at 18-19, 20, 22, 25, 86-88.)  She ultimately explained that her requirement that Gross post a sales gain in December and recommendation that Gross be discharged had "a lot [] to do with the day-to-day activities . . . in the store," stating that if Gross chose not to do the activities, he must have "believe[d] [he knew] better than everybody" and would have to "take accountability for the sales."  (Def.'s LR Resp. ¶ 24; Def.'s LR Reply ¶ 33; Potter Dep. at 86-89.)

In December 2003, only 5 of the 24 stores in the district recorded a sales gain, and the district experienced a 9.4% sales loss. (Pl.'s LR Resp. ¶ 33; Def.'s LR Reply ¶ 33; Def.'s LR Resp. ¶ 23; Pl.'s LR Ex. G, Bates No. 000364.) RadioShack's CEO, Dave Edmondson, gave a recorded broadcast address around this time during which he essentially forgave the performance of all managers for the month of December. (Def.'s LR Resp. ¶ 24.) He stated, "[I]t became very difficult to get a sales gain. Congratulations to all who did, but frankly, [RadioShack's] planning process made it too difficult for everyone to attain that goal during the quarter, and especially in the month of December." (Def.'s LR Resp. ¶ 24.)[9]

D.    **Gross's Age-Based Comparatives and Evidence**

Gross claims that Matt Savage, his younger replacement, is similarly situated to him and was treated more favorably. (Gross Dep. at 136-37; Pl.'s LR Resp. ¶ 44.) Gross admits, however, that he does not know anything about Savage's qualifications except that he previously worked as a sales associate in the Fox Valley store. (Pl.'s LR Resp. ¶ 44.)[10]

---

[9]  December was not atypical for the district, which had only two months of sales gains for the entire year 2003. (Def.'s LR Resp. ¶¶ 23, 29.)

[10]  Gross claims that Savage failed his managerial interview and was not ready to run a store. (Pl.'s LR Resp. ¶ 44; Gross Dep. at 136-37.) However, the evidence relied upon in support of that assertion was his own testimony, based on hearsay. Gross provided no evidence from Louis Krepert, the person who attended the Savage interview and would have the requisite knowledge. Thus, that assertion will not be considered. In addition, Gross claims that Savage was given liberties and not disciplined in the same manner that Gross was. (Pl.'s LR Resp. ¶ 44.) However, the evidence relied upon by Gross in support of that assertion (the affidavit of Tim Shanley, Pl.'s LR Ex. K) is conclusory and does not reflect the competence needed to make those statements. Thus, those statements are stricken from Shanley's affidavit and will not be considered either.

Gross also claimed, at his deposition, that Dan Husak, a younger store manager, is similarly situated to him and was treated more favorably. (Gross Dep. at 138-39.) According to Gross, Husak's store had "more than a year's worth of continuous sales losses." (Gross Dep. at 139-40.) The losses occurred prior to the time that Potter became district manager. (Gross Dep. at 139-40.) There is no evidence regarding the size of those losses or what factors were considered in allowing Husak to remain a store manager despite those losses. (Pl.'s LR Resp. ¶¶ 42, 43; Gross Dep. at 139-40.)

Gross also relies on several statements allegedly made by Frank or Potter. As discussed further below, there are some problems with Gross's use of those statements as evidence in his case, but they are set out here as part of the evidence Gross advances. One statement, which Frank made at his first district meeting with store managers, was that one of the ways he achieved success was to "replace all of the old employees." (Def.'s LR Resp. ¶ 12; Gross Dep. at 129.)[11] Another statement was made in November 2003, while Potter and Frank were conducting a performance review at the Batavia store. (Def.'s LR Resp. ¶ 15.) Frank turned to Potter as he was leaving the store and stated, "With two blacks and two old farts working here we do not need to worry about EEOC complaints anywhere in the region." (Pl.'s LR Stmt. ¶ 17; Pl.'s LR Ex. J, Nicholson Aff.) Potter laughed and the two proceeded to walk out of the store. (Pl.'s LR Stmt. ¶ 17; Nicholson Aff.)[12] The other statements were made to Paul Lindsey, a store manager in the Wheaton store who

---

[11] In its LR Response, RadioShack does not specifically deny that this statement was made and instead responds, "Admit Gross so testified." (Def.'s LR Resp. ¶ 12.) If a party disputes a statement, it must point to specific evidence in the record to support its contention. Otherwise, that statement is deemed admitted. L.R. 56.1(b)(3).

[12] Both Frank and Potter deny that Frank ever made such statement. (Potter Dep. at 92-93; Def.'s Reply Ex. E, Frank Aff. ¶ 4.) However, for purposes of this motion only, the court will

was discharged in June 2004 when he was 62 years old. (Pl.'s LR Ex. H, Mem. Op. & Order at 9 in *Lindsey v. RadioShack Corp.,* Case No. 05 C 638; Def.'s LR Resp. ¶ 31; Pl.'s LR Ex. F at 5.) Frank told Lindsey in February 2004 that he "could get any kid with no training off the streets to do a better job than [Lindsey was] doing." (Def.'s LR Resp. ¶ 33; Pl.'s LR Ex. I at 21.) Frank also asked Lindsey if he planned on retiring soon. (Def.'s LR Resp. ¶ 35; Pl.'s LR Ex. I at 22.) Potter told Lindsey at the time he was put on a performance improvement plan called "Fix 1500" in April 2004 that perhaps he should apply for a job at Home Depot because they were hiring older people. (Def.'s LR Resp. ¶ 34; Pl.'s LR Ex. I at 13, 14.)

### E.     Gross's Race-Based Comparatives

Gross asserts that David Bawuah, a black male, is similarly situated to him and was treated more favorably than he. (Gross Dep. at 146; Pl.'s LR Resp. ¶ 50.) Bawuah was assigned to the position of store manager at the Batavia store in approximately March 2003 despite Gross's request that he be transferred back to that store. (Pl.'s LR Resp. ¶ 50; Def.'s LR Resp. ¶ 21; Gross Aff. ¶¶ 11, 12; Pl.'s LR Ex. E, Bates No. 000643.) According to Gross, Bawuah was a "three month rookie" when he was assigned to the Batavia store, although it appears he had worked at RadioShack before that time as well. (Pl.'s LR Resp. ¶ 54; Gross Dep. at 146-47.)[13] From the time Bawuah was assigned to the Batavia store (March 24, 2003) until February 2004, the store suffered consecutive

---

construe this dispute in favor of the non-movant and assume the statement was made.

[13] Bawuah was a "re-hire" in December 2002; thus, presumably he had more than three months of experience. (Def.'s LR Resp. ¶ 21; Pl.'s LR Ex. E, Bates No. 000642.)

monthly sales losses. (Def.'s LR Resp. ¶ 22; Pl.'s LR Ex. E, Bates No. 000643.)[14] Bawuah left RadioShack in April 2004 because management wanted him to step down to get more training and Bawuah did not want to comply. (Pl.'s LR Resp. ¶ 54; Gross Dep. at 149.)

Gross asserts that Jay Beyah, a black male, is also similarly situated to him and was treated more favorably. (Pl.'s LR Resp. ¶¶ 56, 57; Gross Dep. at 150-51.) Beyah worked at the Charlestowne Mall store after Gross left that store. (Pl.'s LR Resp. ¶ 56; Gross Aff. ¶ 17.) According to Gross, Beyah began recording sales losses immediately after Gross left, and continued that pattern for over four years, until Beyah resigned in 2003. (Pl.'s LR Resp. ¶ 56; Gross Aff. ¶ 17.) While Beyah was store manager, the store's appearance was not maintained properly and its volume decreased from over $600,000 per year to under $500,000, ultimately resulting in a store reclassification. (Gross Aff. ¶ 17.) Despite his poor performance, Beyah was designated a team leader. (Pl.'s LR Resp. ¶ 57; Gross Dep. at 153-54; Gross Aff. ¶ 19.) Beyah left RadioShack in September 2003 and was replaced by Bruce Sullivan, a white male over age 40. (Pl.'s LR Resp.

---

[14] Gross submits what purports to be a written statement from Bawuah in which he states that 2003 "was a very difficult year and [that he] kept asking [Gross] for advice," but that Frank gave him "a break," telling him he could "wipe the slate clean and start the new year strong since [he] was going against [his] own numbers." (Pl.'s LR Ex. C, Bawuah Stmt.) Bawuah concluded that "it was a great relief to know [his] job was secure." (Bawuah Stmt.) Bawuah's written statement cannot be relied on as evidence in this case because it is unsworn. Indeed, the "statement" does not even bear an original signature or date and there is no indication it was signed under penalty of perjury, as required by 28 U.S.C. § 1746. *See Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985) (stating that unsworn statements do not meet the requirements of Rule 56(e)). *See also Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (document submitted without a supporting affidavit verifying its authenticity was inadmissible and could not be considered for purposes of summary judgment).
    Gross also cites the affidavit of Dan Nicholson to support the factual assertion that Bawuah complained about receiving little training before becoming a store manager and that he felt his promotion to the Batavia store was based on his race, not his qualifications. (Nicholson Aff. ¶ 7.) However, those statements are hearsay and therefore cannot be relied upon either.

¶¶ 56, 58.)

**F.    Gross's Sex-Based Comparatives**

Gross alleges that Yolanda Wells, a female store manager, is similarly situated to him and was treated more favorably. (Gross Dep. at 141.)  Wells transferred to the Naperville store in February 2003. (Pl.'s LR Resp. ¶ 35.)  In June or July 2003, Wells's store demonstrated a 16.4% sales gain. (Pl.'s LR Resp. ¶ 35.)  That was around the same time that Gross's figures significantly rebounded, although, unlike Wells, Gross did not demonstrate a sales gain. (Pl.'s LR Resp. ¶ 35; Def.'s LR Resp. ¶ 13; Gross Aff. ¶ 14.)  In April 2004, Wells was placed on the "Fix 1500" performance improvement plan. (Def.'s LR Reply ¶ 35.)  In conjunction with this plan, Potter advised Wells that she was "concerned and worried about whether [Wells] possess[ed] the skills necessary to run a RadioShack store effectively." (Pl.'s LR Resp. ¶ 36.)  Wells was informed that she would be given specific expectations with a timeline, and that failure to achieve those expectations would result in her being removed from the position of store manager. (Pl.'s LR Resp. ¶ 36.) Before the month was over, Wells resigned. (Pl.'s LR Resp. ¶ 37.)  Wells asserts that she was not threatened with discharge prior to her resignation. (Pl.'s LR Ex. D, Wells Aff., Ex. 1.)  Besides Wells, there was only one other female store manager in the district between February and June 2003, Shell Van Gerpen. (Pl.'s LR Resp. ¶ 39.)  Potter discharged Van Gerpen from employment on June 20, 2003 and replaced her with a male. (Pl.'s LR Resp. ¶ 39.)

Gross asserts that Potter, his female district manager, is also similarly situated to him and was treated more favorably. (Gross Dep. at 144.)  Gross bases that assertion on the fact that Potter was

promoted to the position of district manager despite having had a poor sales record as a store manager in Bolingbrook. (Gross Dep. at 144.) Gross was considered for a district manager position at one time in the 1980s, but withdrew his name from consideration for personal reasons and never subsequently applied. (Pl.'s LR Resp. ¶ 38.)

## LEGAL STANDARD

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id*. at 255. The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id*. at 324. The non-moving party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id*.; *see also Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) (non-moving party is required to present evidence of "evidentiary quality" (*i.e.*, admissible documents or attested testimony, such

as that found in depositions or in affidavits) demonstrating the existence of a genuine issue of material fact). "[N]either 'the mere existence of some alleged factual dispute between the parties' . . . nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (quoting *Anderson*, 477 U.S. at 247 and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

### A. Gross's Age Discrimination Claim

The ADEA prohibits an employer from discharging an individual because of his age. 29 U.S.C. § 623(a)(1). "To establish a claim under the ADEA, a plaintiff-employee must show that 'the protected trait (under the ADEA, age) actually motivated the employer's decision' – that is, the employee's protected trait must have 'actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome.'" *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (quotations omitted). To defeat a motion for summary judgment in a discrimination case, a plaintiff must either present direct evidence that his discharge was the result of discrimination, or use the indirect "burden-shifting" approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Hemsworth,* 476 F.3d at 490-91; *Flores v. Preferred Tech.*

*Group*, 182 F.3d 512, 514 (7th Cir. 1999).[15]  Although Gross focuses his argument on the indirect method of proof, he also cites evidence of statements allegedly made by his supervisors which he argues could establish that RadioShack was motivated to discharge him based on his age.  (Pl.'s Resp. at 11-12.) Therefore, giving Gross's arguments the benefit of the doubt, the court will evaluate Gross's age discrimination claim under both methods.

## 1.    Direct Method

"Direct evidence" is evidence which, if taken as true, permits a reasonable fact-finder to find the particular fact in question to be true "without reliance upon inference or presumption." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997).  In applying the direct method of proof, the court must determine whether Gross has provided sufficient circumstantial evidence in the record to demonstrate a genuine issue of material fact.  Circumstantial evidence demonstrating intentional discrimination includes, *inter alia*, "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Sun v. Board of Trs. of Univ. of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007).  For purposes of defeating summary judgment in a discrimination case, direct evidence "must not only speak directly to the issue of

---

[15]  As the Seventh Circuit recently explained, "The distinction between the two avenues of proof is 'vague,' . . . and the terms 'direct' and 'indirect' themselves are somewhat misleading . . . . '[D]irect' proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (*e.g.*, "You're too old to work here."), but also includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences. . . .  The 'indirect' method of proof involves a subset of circumstantial evidence (including the disparate treatment of similarly situated employees) that conforms to the prescription of *McDonnell Douglas*." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006) (internal citations omitted.).

discriminatory intent, it must also relate to the specific employment decision in question." *Randle v. LaSalle Telecomm., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989). *See also Rush v. McDonald's Corp*., 966 F.2d 1104, 1116 (7th Cir. 1992) ("[I]n order to suffice as evidence of racial animus in support of a claim of disparate treatment, the racial remarks . . . must be 'related to the employment decision in question.'"). Further, "isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Hemsworth*, 476 F.3d at 491 (quotations and citations omitted). In summary, a particular remark can provide an inference of discrimination when it was "(1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Id.* (citations omitted).

Gross's proposed evidence in applying the direct method consists of the following comments: (1) Potter's statement to Lindsey at the time he was put on the Fix 1500 program that perhaps he should apply for a job at Home Depot because they were hiring older people; (2) Frank's comment to Lindsey that he "could get any kid with no training off the streets to do a better job than [Lindsey] [was] doing;" (3) Frank's question to Lindsey about whether he planned on retiring soon; (4) Frank's comment to Potter that "[w]ith two blacks and two old farts working here [they did] not need to worry about EEOC complaints anywhere in the region;" and (5) Frank's statement to store managers that one way he achieved success was to "replace all of the old employees."

Those comments do not provide direct evidence of age discrimination in the decision to terminate Gross, for a number of reasons. Taking first the three comments allegedly made to Lindsey, there is the threshold question of whether Gross has submitted evidence of those comments. Gross himself cannot testify to those comments and does not submit an affidavit from Lindsey attesting to the comments. Instead, Gross submits the Consolidated LR Statements of Facts and

-19-

Responses filed in the *Lindsey v. RadioShack Corp*. case, No. 05 C 638, which is currently pending

before Judge Denlow. (*See* Pl.'s LR Ex. I.) In that case, RadioShack did not dispute that Frank

made the remarks about "taking a kid off the street," and asking Lindsey if he intended to retire soon.

(Pl.'s LR Ex. I at 21, 22.) Rather, RadioShack stated that it "does not contest these facts for

purposes of its motion for summary judgment," but "reserves the right . . . to contest any or all of

these facts at trial if its motion for summary judgment is denied." (Def.'s Reply Ex. D, Def.'s

LR Stmt. in *Lindsey* case at 1 n. 1; *see also* Def.'s Reply Ex. C, Def.'s Mem. Supp. Mot. Summ. J.

in *Lindsey* case at 9 n. 3 (RadioShack "denies that any of these alleged statements [were] made but

recognizes that the Court must assume the truth of Lindsey's testimony in this regard for purposes

of the instant motion.") Gross admits that he has not presented evidence of the remarks allegedly

made to Lindsey, but, without citing any authority, asks this court to "take judicial notice" of the

those remarks. (Pl.'s LR Resp. at 30 n. 9.) It is questionable whether RadioShack's LR Response

in another case is a matter of which the court may take judicial notice under Fed. R. Evid. 201.

Whether a LR Response can constitute an admission under Rule 801 for purposes of anything other

than the motion for which it is submitted is also doubtful. *See Chen v. Mayflower Transit, Inc.*,

No. 99 C 6261, 2004 WL 2535258 (N.D. Ill. Sept. 23, 2004) (Brown, M.J.). However, in the spirit

of construing the evidence in favor of the non-movant, this court will assume the truth of Lindsey's

testimony for purposes of this motion only.

Even considered, those remarks do not constitute direct evidence of age discrimination in the

decision to terminate Gross, because they relate, at most, to the discharge of Lindsey. Gross had

already been discharged when the comments were made and there is no causal connection between

the comments and Gross's termination. *See Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir.

1993) (employee failed to prove discrimination under the direct method because there was no causal connection between his constructive discharge and manager's age-related remarks, where the remarks were not related to the employment decision in question); *Randle*, 876 F.2d at 569 (stating that direct evidence must "relate to the specific employment decision in question"); *Rush*, 966 F.2d at 1116 (same); *see also E.E.O.C. v. St. Michael Hosp. of Franciscan Sisters, Milwaukee, Inc.*, 6 F. Supp. 2d 809, 825 (E.D. Wis. 1998) (decision-maker's "discriminatory attitudes" did not constitute direct evidence of discrimination because the conversation did not deal specifically with the decisions regarding the plaintiff, and "direct evidence must demonstrate that the decision-maker discriminated in the precise decision under attack"). To conclude that the comments made to Lindsey demonstrate that Gross was discharged because of his age would require a reasonable fact-finder to rely upon "inference or presumption," which is insufficient. *Plair*, 105 F.3d at 347. *See also Czarnecki v. Chicago Park Dist.*, No. 98 C 2908, 2000 WL 1644372 at *2 (N.D. Ill. Oct. 24, 2000) (Gottschall, J.) (finding no direct evidence of discrimination where jury "would have to make an inferential leap" to reach such conclusion). Thus, the comments to Lindsey cannot provide an inference of discrimination with respect to Gross's discharge.

Moreover, there were potentially "suspicious" circumstances surrounding the comments made to Lindsey and the termination of his employment (as noted in the decision denying RadioShack's motion for summary judgment in the *Lindsey* case), which are not present here. (Pl.'s LR Ex. H at 14, 15.)[16] For example, Lindsey was discharged two months before the deadline he was

---

[16] The court in *Lindsey* presented the facts in a light most favorable to Lindsey (Pl.'s LR Ex. H at 1) and noted, for example, that a jury "could" find that various facts surrounding Lindsey's termination were "suspicious," not that a jury necessarily would make such finding. (*Id*. at 15.) *See also id.* at 16 ("A reasonable jury could also conclude that RadioShack's proffered reasons

given by which to improve his performance.  (*Id*. at 7, 9, 15.)  In addition, Lindsey showed steady improvement and was "within striking distance" of his performance targets before he was discharged.  (*Id*. at 8, 9, 15; Pl.'s Resp. at 6.)  Finally, there was evidence supporting the fact that Frank waited to discharge Lindsey until after his replacement was trained.  (Pl.'s LR Ex. H at 14.)  Based on those facts, among others, Judge Denlow found that a jury could conclude that Potter and Frank had made up their minds to discharge Lindsey because of his age, and then set him up to fail.  (*Id*. at 14, 15.)  There is no evidence of any of those factors here, *i.e.*, that Gross was discharged before the final deadline by which he was given to improve (indeed, he was given 90 days to improve initially, and then given more time); that he was within striking distance of meeting the targets set for him; or that his replacement had been trained and was waiting in the wings.  Finally, it bears mentioning that Lindsey was 62 years old at the time of his discharge, whereas Gross, who although was in the protected age class, was much younger at age 49.

The two remaining comments also fail to relate in any way to the decision to terminate Gross's employment.  Frank's comment that he and Potter need not worry about EEOC complaints with two "old farts" working at the Batavia store cannot be considered direct evidence of discrimination as it was made outside the context of the decision to discharge Gross, and would require the same inferential leap as the comments made to Lindsey.  Indeed, Gross did not even work at the Batavia store at the time the comment was made.  It was the type of crude banter that falls into the "stray remarks" category.  *See, e.g., Schwietz v. Nicolet Instrument Corp*., No. 99 C 3068, 2000 WL 1038123 at *3 (N.D. Ill. July 24, 2000) (Shadur, J.) (holding that reference to employee

---

are true, and that age was not a determining factor in RadioShack's decision to terminate Plaintiff.").

as an "old fart" did not constitute direct evidence as it appeared to have been made in the context of random office banter); *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993) (decision-maker's statements that younger person could work faster and that plaintiff was an "old fart" were "stray remarks" and not direct evidence).[17]  Finally, with respect to Frank's statement at a district meeting that he achieved success by replacing old employees, there is no evidence that the term "old" referred to a person's age rather than a person with long tenure.  Again, the court would have to rely upon "inference or presumption" to reach such conclusion, particularly here, given that the majority of store managers in the district were over 40 (Pl.'s LR Resp. ¶ 47) and there is no evidence that Frank took any steps to discharge those persons.  *Plair*, 105 F.3d at 347; *Czarnecki*, 2000 WL 1644372 at *2.  Thus, Gross cannot defeat RadioShack's motion for summary judgment on the basis of direct evidence, and the court will proceed to the indirect method.

### 2.    Indirect Method

Under the indirect "burden-shifting" approach of *McDonnell Douglas*, 411 U.S. at 802, Gross must first establish a prima facie case of discrimination.  Assuming Gross can make out a prima facie case, RadioShack must then articulate a legitimate, non-discriminatory reason for his discharge. Gross is then obliged to establish that the reason articulated is pretextual.  *Luks*, 467 F.3d at 1055. To establish a prima facie case, Gross must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employee action;

---

[17]  In addition, if anything, the comment indicates a desire to keep such employees on the payroll in order to avoid receiving any EEOC complaints.  *See Hemsworth*, 476 F.3d at 489, 491 (noting that comment that eliminating the employment of a large percentage of employees over 40 would be "a problem" demonstrated employer's awareness of its legal obligations under the ADEA).

and (4) the position remained open or he was replaced by someone substantially younger. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 472 (7th Cir. 2002).

There is no dispute that Gross is a member of the protected age class (he is over 40), that he suffered an adverse employment action (he was discharged), and that he was replaced by someone substantially younger (Matt Savage, who was in his 20s). But Gross cannot establish that he was meeting his employer's legitimate job expectations. In August 2003, when Gross was placed on "Watch," the first step of RadioShack's counseling process, he ranked at the bottom of the district and 220/221 in the region in performance rankings. Gross's store's sales were down 21%, and profits were down 10%. In addition, numerous problems with his performance had already been documented in various store visit reports leading up to that time. A January report of that year noted that his store did not demonstrate a sales gain that month. A February report noted that sales from Gross's store were down 3.85%, wireless and satellite hit rates were unacceptable, and several of Gross's employees needed to complete certifications. An April report noted that many phones needed parts, the repair log needed updating, the parts per ticket sold rating was below average, the store was losing satellite units, and certain meetings with sales associates had not been conducted. A June report noted that one of the phones sold lacked proper paperwork and employee certifications still needed to be completed.

In addition, Gross was given plenty of warning through RadioShack's formal counseling procedure to turn his performance around. After being placed on "Watch," Gross was advised to meet the district average in sales gains and profit turns within the next month and perform certain tasks to help him achieve that goal. When Gross failed to meet those requirements by November (his store had a year-to-date sales loss of 20.2% and year-to-date profit loss of $21,788 by this time),

Gross was moved from "Watch" to "Concern" on the counseling process, and warned that he would be put on "Notice" in 30 days if he failed to execute a specific list of tasks over the next four weeks. When Gross again failed to perform all of the tasks required of him, he was placed on "Notice" and advised that a failure to create profitable sales growth that month would result in his discharge. Notably, Gross did not dispute that he failed to meet all of the tasks required of him before being placed on "Notice;" specifically, that his associates failed to complete their certifications, that his store's ticket average was below the dollar requirement, and that he did not fax all of the reports (associate goal/activity cards and count sheets) to the district office, as required. Finally, Gross did not dispute that he did not record a sales gain in December, the last requirement placed on him before he was discharged. Nor did Gross dispute that by the end of 2003, his store had demonstrated sales losses every single month that year, and had fallen below the district average in 11 of the 12 months.

It is certainly legitimate for an employer to expect an employee to record at least one sales gain and to rise above the district average more than one time in a 12-month period. It is also legitimate for an employer to expect a manager to conduct the various tasks required of him, such as ensuring that associates complete their certifications, maintaining a store ticket average of a specific amount, and faxing various reports to the district office. Gross has presented no triable issue of material fact indicating that he was meeting his employer's legitimate expectations as of December 2003. To the contrary, as discussed above, Gross had been warned through the formal counseling process that he was failing to meet his employer's expectations, was advised on what steps to take to help meet those expectations (many of which he admitted were reasonable), and failed to complete all of those steps.

Gross argues, however, that the requirements placed on him were unreasonable and were set with the knowledge that he would fail and have to be discharged.  (Pl.'s Resp. at 9-11.)  Thus, Gross argues, the expectations that he failed to meet were themselves a pretext for discrimination.  (Pl.'s Resp. at 9-10.)  *See Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1404-06 (7th Cir. 1996).  To support this argument, Gross relies on the fact that he was denied a request to be transferred back to the Batavia store where he would face fewer challenges, that he was required to post a sales gain in December 2003, and that discriminatory comments discussed above were made.  (Pl.'s Resp. at 9-11.)

The fact that Gross was denied a transfer back to the Batavia store cannot be considered evidence of pretext.  Gross had been granted a request to transfer to the Naperville store only six months prior; thus, it was not unreasonable for RadioShack to deny Gross's request for another transfer so soon after, especially given that there is no evidence that any other employee was ever granted two transfer requests in such a short time frame.  (Pl.'s LR Resp. ¶ 51.)  RadioShack's denial of Gross's request to transfer back to the Batavia store is therefore not evidence that RadioShack wanted Gross to fail, and not evidence of pretext.

The requirement that Gross post a sales gain in December 2003 also is not evidence of pretext.  Although, as Gross points out, it was a difficult objective to meet given the closing of the True Value store and the fact that the district as a whole was performing poorly, Gross was warned that he would be discharged for not meeting that objective only *after* he failed to perform the various tasks assigned to him as part of the counseling process.  As Potter explained, if Gross were to choose not to do the activities required of him, he would have to take accountability for the results.  Gross complains that he did not have enough employee hours to perform all of the "extra tasks" required

of him to help him record a sales gain (Pl.'s Resp. at 10-11), but Gross admits that the number of employee hours he was assigned was "standard." Moreover, Gross had time to improve his performance on some of these tasks long before December. Gross was warned in February, April, June, August and November to address his employee training issues, for example. While Gross complains that Potter did not place these requirements on younger store managers (Pl.'s Resp. at 11), he has not identified any employee who also suffered 12 straight months of sales losses, advanced to the last step in the "Watch Concern Notice" procedure, and failed to complete all of the requirements set to help him achieve a sales gain.[18]  (Def.'s LR Reply ¶ 33.)  Although the requirement that Gross record a sales gain in December may have been difficult, the Seventh Circuit has made clear that the court's role "is not to make suggestions to managers on how to deal with employees more fairly or effectively." *Kohls v. Beverly Enter. Wisc., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001).  That is because "courts do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003).  *See also Robin v. Espo Engr. Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000) (stating that "it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers").  In this case, there is simply no evidence that Potter's

_____

[18] Although Gross identified Bawuah as someone whose store suffered 13 straight months of sales losses, Bawuah was not assigned to the Batavia store until the end of March 2003; thus, by December 2003, when Gross's store had posted 12 straight months of losses, Bawuah's store could not have posted more than 9 months of losses.  More importantly, there is no evidence that Bawuah failed to complete requirements set for him to help him achieve a sales gain, which is the very reason why Gross was placed on Notice.  Gross also identifies Wells as someone who recorded many monthly losses.  However, in June or July 2003, Wells demonstrated a 16.4% sales gain.  Moreover, Wells was subsequently placed on a performance improvement program and advised that a failure to meet certain expectations would lead to her removal from management.

requirement that Gross record a sales gain was set solely with the knowledge that Gross would fail, or otherwise pretextual.

Finally, the discriminatory comments allegedly made by Potter and Frank do not establish that the reason given for Gross's discharge was pretextual. Although Gross argues that the comments demonstrate that Potter and Frank were motivated to terminate his employment based on his age (Pl.'s Resp. at 11-12), the comments do not support that conclusion. As discussed above, even construing them together, the comments fall outside the context of the decision to terminate Gross's employment and are more akin to "stray remarks" or random office banter. Additionally, other evidence demonstrates a lack of discriminatory animus by RadioShack. For instance, Potter discharged four other sales managers besides Gross in 2003, all of whom were under the age of 40, and three of whom were under age 30. (Pl.'s LR Resp. ¶ 46; Def.'s LR Resp. ¶ 36.)[19] Moreover, there is no evidence that Frank, who made most of the alleged comments, took any steps to discharge employees over 40 during this time period.

Thus, Gross cannot establish a prima facie case and, even if he could, cannot establish that the reason given for his discharge was pretextual. Accordingly, RadioShack is entitled to summary judgment on Gross's ADEA claim.[20]

---

[19] Although, as Gross notes, they were discharged for reasons other than poor performance, such as an inventory shortage or a missing bank deposit, that does not detract from the fact that they were still discharged, and were under age 40. (Pl.'s LR Resp. ¶ 46.)

[20] Although not necessary based on the analysis above, Gross also cannot show that similarly situated younger employees were treated more favorably. In his Response, Gross identifies only Matt Savage, his replacement who was under age 40, as someone who was similarly situated and treated more favorably. Although Gross had more experience than Savage, there is no evidence that Savage's performance at the time he was chosen to replace Gross was as unsatisfactory as Gross's. Thus, he was not similarly situated. There is also insufficient support for Gross's

**B.     Gross's Race Discrimination Claim**

Gross argues that his discharge was also unfairly based on his race (white) in violation of Title VII. Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). As with age discrimination claims, an employee alleging discrimination based on race may demonstrate such incidents through direct or indirect proof, as outlined above. *Phelan v. City of Chicago,* 347 F.3d 679, 684 (7th Cir. 2003). Gross does not have any direct evidence that he was discriminated against on the basis of his race.[21] Thus, he must proceed under the indirect, burden-shifting method.

In cases of "reverse discrimination," *i.e.*, where members of majority groups, such as whites, believe they were subject to employment discrimination, the first prong of the prima facie case (that

---

contention that Savage was treated more favorably once he was in the position, because the only evidence on this point is the affidavit of Tim Shanley (Pl.'s LR Ex. K ¶¶ 3, 4), and Shanley has not laid out a sufficient foundation to testify to such facts.

Gross does not make any arguments in his Response regarding any other younger store managers, including Dan Husak, a younger store manager who he claimed at his deposition was similarly situated to him. Thus, Gross waived any argument that any other younger managers were similarly situated and treated more favorably. The court will not consider any arguments made in the LR Statements of Facts or Responses to such Statements, because that is not the place for argument. *See Zimmerman Prop., Inc. v. Grund*, No. 03 C 3359, 2007 WL 433533 at *2 (N.D. Ill. Feb. 2, 2007) (Andersen, J.) (noting that "it is inappropriate to include legal conclusions and/or argument in the Rule 56.1 statements of facts") (citation omitted).

[21] The only comment alleged which relates to race – and Gross does not even discuss it in conjunction with his race claim (*see* Pl.'s Resp. at 12-14) – is Frank's comment to Potter, discussed above, that "With two blacks and two old farts working here [they did] not need to worry about EEOC complaints anywhere in the region." That comment, however, was made outside the context of the adverse employment action at issue, and would require an inferential leap by the fact-finder to conclude that Gross was discharged because he is white. *See Czarnecki*, 2000 WL 1644372 at *2.

he is a member of a protected class) cannot be used. *Id.* at 684 (citing *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999)). Instead, a plaintiff satisfies the first prong by demonstrating "background circumstances" that indicate a particular employer has "reason or inclination to discriminate invidiously against whites" or evidence that "there is something 'fishy' about the facts at hand." *Id.* (citations and quotations omitted). Although it has been argued that this prong adds an unfair burden on the plaintiff, the Seventh Circuit has explained that because discrimination against whites is "a less common phenomenon" than discrimination against non-whites, the non-minority plaintiff must present evidence to show why it is likely that in this case, the employer had engaged in such unusual behavior. *Id.* at 684-85.

Applying this modified prima facie test to the case at hand, Gross is unable to demonstrate the necessary "background circumstances." He does not provide any facts which would demonstrate why his supervisors would be inclined to discriminate against whites. Potter and Frank, the supervisors at RadioShack who made the decision to discharge him, were white. Likewise, Matt Savage, the employee hired to replace Gross (who was selected by those same supervisors) (Potter Dep. at 98), was also white. Further, there is no evidence that Potter or Frank ever said anything discriminatory or derogatory about Gross's race, white, or – as would be more likely the case given that they themselves are white – ever suggested that they would like to see fewer whites employed at RadioShack. (Pl.'s LR Resp. ¶¶ 59, 60.) These facts weigh against a conclusion that RadioShack had an "inclination to discriminate invidiously against whites" or that there was "something 'fishy' about the facts at hand." *Phelan,* 347 F.3d at 684.

Gross states that his claim of race discrimination relies primarily on the fact that Bawuah, a black male, was transferred to the Batavia store rather than himself, and his claim that Bawuah was

treated more favorably than he with respect to their sales losses. (Pl.'s Resp. at 12-13.) Gross takes issue with the fact that Bawuah received the transfer over him when he had more experience than Bawuah, who was a "three month rookie." However, Gross had been granted a request to transfer to the Naperville store only six months prior. Thus, it was not unreasonable for RadioShack to deny Gross's request for a second transfer so soon thereafter, especially in light of the fact that there is no evidence that other store managers were granted two transfer requests in such a short time frame. The fact that Bawuah may have been a "rookie" is therefore irrelevant in this context. As for Gross's complaint that Bawuah was unfairly given more time to manage his store effectively, the facts do not support that assertion even assuming, *arguendo*, consideration of Bawuah's unsworn statement. (*See* n. 14 above.) As of December 2003, when Bawuah was allegedly given a "break" and told he could wipe out all of his monthly losses for the year, Bawuah's store had posted only nine months of losses, less than the 12 months of losses Gross's store had posted. Bawuah was only a "three month rookie," a fact that weighs against a finding that he was similarly situated to Gross, as a rookie could reasonably be given more time to learn how to manage a store than a veteran manager. Significantly, after Bawuah had managed the Batavia store for a year, he resigned because RadioShack management wanted him to step down to get more training. Thus, Bawuah, too, was confronting issues with management. In summary, the circumstances surrounding Bawuah's transfer to the Batavia store and his ability to manage his store do not provide the type of "background circumstances" which would indicate that RadioShack had "reason or inclination to discriminate invidiously against whites," or indicate that "there is something 'fishy' about the facts at hand." *Phelan*, 347 F.3d at 684.

Gross's argument that Jay Beyeh was also treated more favorably due to his race, black (Pl.'s

Resp. at 13-14), similarly fails to present the necessary "background circumstances" that would indicate reverse race discrimination. Gross argues that Beyeh's store's sales decreased by over $100,000 but that Beyeh was not disciplined. (Pl.'s Resp. at 13-14.) RadioShack counters that part of those losses occurred prior to 2003 under a different manager and in a different district and are therefore not comparable. As for the losses that occurred while Beyeh and Gross reported to the same district manager (2003), Beyeh could not have posted more than nine months of losses, because he resigned in September 2003. (Gross Dep. at 152-53; Def.'s Reply at 12-13; Def.'s Mem. at 19.) Gross was not discharged until he posted 12 months of consecutive losses. Finally, it bears mentioning that Beyah was replaced by a white male. Gross also argues that he was required to provide replacement coverage for Beyah during Beyah's "personal emergencies," whereas Gross was not provided the same courtesy. (Pl.'s Resp. at 14.) Gross does not provide any evidence regarding when Beyah's emergencies occurred, or who made the decisions with respect to Beyah's coverage requests; thus, there is no evidence that Beyah's and Gross's coverage requests were even handled by the same district manager. Gross could have provided that evidence in his own affidavit or in an affidavit by Beyah, but he did not.[22] There would have to be more evidence regarding this situation for the court to conclude that RadioShack had "reason or inclination to discriminate invidiously against whites" on this basis. *Phelan,* 347 F.3d at 684.

Even if Gross's arguments could establish the necessary "background circumstances," his reverse racial discrimination claim would still fail because he did not meet RadioShack's legitimate

---

[22] Potter, the person who denied Gross's coverage request, only supervised Beyah for nine months out of the "over four years" that Beyah worked at the Charlestowne Mall store. (Gross Aff. ¶ 17; Gross Dep. at 151-52; Pl.'s LR Resp. ¶ 15.)

expectations, as discussed above in conjunction with Gross's ADEA claim. Accordingly, RadioShack's motion for summary judgment is also granted with respect to Gross's race discrimination claim.


## C.    Gross's Sex Discrimination Claim

Gross argues that his discharge was also unfairly based on his sex (male) in violation of Title VII. Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). As with an age or race discrimination claim, an employee alleging discrimination based on sex may demonstrate such incidents through direct or indirect proof. *Phelan,* 347 F.3d at 684. Gross does not have any direct evidence that he was discriminated against on the basis of sex.[23] Thus, he must proceed under the indirect, burden-shifting method.

Because Gross is alleging discrimination based on the fact that he is male, he must satisfy the prima facie case used in "reverse discrimination" cases by demonstrating "background circumstances" that indicate RadioShack has "reason or inclination to discriminate invidiously" against males or evidence that "there is something 'fishy' about the facts at hand." *Id.* (citations and quotations omitted).

Once again, Gross cannot demonstrate the necessary "background circumstances." He does

---

[23]  The only comment Gross presents on this issue is Frank's question to Wells, "How does it feel being the only female [manager]" in the district? (Wells Aff., Ex. 1; Gross Dep. at 135-36.) Gross provides no argument as to why that question should be considered as direct evidence of discrimination against him, and the court cannot imagine any. Thus, that comment will not be considered further.

not provide any facts which would demonstrate that his supervisors were inclined to discriminate against males. Frank, the regional manager who approved the decision to discharge him, is male. Matt Savage, the employee who was hired to replace Gross, is male. Moreover, between February and June 2003, all of the store managers in the district were male except Wells and Shell Van Gerpen. Van Gerpen was discharged in June 2003 (and replaced with a male), while Wells was placed on a performance improvement plan in 2004. Further, Gross admits that he never heard Potter or Frank say anything discriminatory or derogatory based on his sex, male, or indicate that they would like to see fewer males employed at RadioShack. (Pl.'s LR Resp. ¶¶ 40, 41; Gross Dep. at 128-29, 132.)

Gross states that his sex discrimination claim is based primarily on Wells, and does not make any arguments regarding any other female store managers. (Pl.'s Resp. at 14.)[24] Although Wells's performance was also unsatisfactory, Wells's store demonstrated a 16.4% sales gain during 2003, whereas Gross's store did not demonstrate any sales gains that year. Moreover, in 2004 Wells was placed on a performance improvement plan. Although Wells was never discharged – a fact Gross relies on in support of his argument – she resigned before the month was over, after she was advised that her failure to meet certain expectations would lead to her removal from her position as store manager. Therefore, she was not a similarly situated employee who was treated more favorably.

In summary, there are no "background circumstances" or evidence that would allow the court

---

[24] Thus, Gross has waived any argument that any other female manager (such as Potter, who he referenced at his deposition) was similarly situated and treated more favorably. In any event, Potter, who was promoted to district manager despite having had an allegedly poor sales record, is not similarly situated to Gross, who withdrew his name from consideration for district manager in the 1980s and never re-applied.

to conclude that RadioShack had "reason or inclination to discriminate invidiously" against males. *Phelan,* 347 F.3d at 684. Even if there were, though, Gross's reverse sex discrimination claim would still fail because he did not meet RadioShack's legitimate expectations, as discussed above. Accordingly, RadioShack's motion for summary judgment is also granted with respect to Gross's sex discrimination claim.

## CONCLUSION

Gross has not produced admissible evidence demonstrating a genuine issue of material fact in support of his age, race, or sex discrimination claims. Thus, RadioShack's Motion for Summary Judgment is granted in favor of the defendant and against the plaintiff.

**IT IS SO ORDERED.**

_____
**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED:  March 26, 2007**